UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

DEBORAH SAVAGE,
    *Plaintiff*,

    v.

SOUTHERN CONNECTICUT STATE
UNIVERSITY,
    *Defendant*.

No. 3:09-cv-00302 (JAM)

**RULING GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff Deborah Savage is a Jewish woman and a tenured professor at defendant Southern Connecticut State University. She was hired by defendant in 1994, and continues working there to do this day. Plaintiff alleges that co-workers have consistently acted in a demeaning and discriminatory fashion towards her, and that she as a result has been subject to the threat of discipline and denied privileges to which she was entitled. She claims that she has been subject to gender and religious discrimination, retaliated against for filing discrimination complaints, and subject to a hostile work environment, in violation of Title VII of the Civil Rights Act, 42 U.S.C. § 2000e.

Defendant has moved for summary judgment on all counts. Because I conclude there are no genuinely disputed issues of fact or law remaining for trial, I will grant summary judgment.

**BACKGROUND**

The following facts are set forth from the admissible evidence of record and as viewed in the light most favorable to plaintiff as the non-moving party. Plaintiff began working for defendant's Department of Economics and Finance in 1994. She was promoted to Assistant Professor and granted tenure in 1997, and was again promoted to Associate Professor in 1999.

She alleges that throughout her time at SCSU, she has been subject to frequent discriminatory treatment as a result of her gender and religion.

Soon after she began working for defendant, in 1994 or 1995, a male colleague, professor Yilma Gebremariam, told her that her life choices were not "right," and that she should have had "more babies." Doc. #52 at 12. She further alleges that at this time, she was excluded from committee meetings because the committee chair did not give her adequate notice of when meetings would be, and also that she was later excluded from important votes because she had missed these meetings. Doc. #52 at 13.

From 1996 to August 2009, Dr. Samuel Andoh was the chairperson for the Economics and Finance Department. In this position, Andoh did not have the authority to discipline, promote or fire other faculty members. Doc. #42-5 at 2 (¶ 17). That authority was held by the Dean of the School of Business. In 2004, the interim dean was Dr. Bharat Bhalla, who was later replaced by Henry Hein in April 2006.

Plaintiff complains of numerous events that occurred between 2004 and March 2007, the date defendant argues is the statute of limitations cut-off for plaintiff's claims. These complaints can be described broadly as falling into four categories: First, she contends that she was excluded from important department meetings because meeting times were irregular and she was not provided adequate notice of meeting times, and also because she and her other female colleagues were often not called on to speak at these meetings and were sometimes insulted. These meetings all appear to have occurred before 2007. *See* Doc. #52 at 18. Second, she makes several complaints regarding insulting comments that Andoh made about her, most notably a memorandum he wrote to her in 2004 criticizing her character and teaching ability. Dean Bhalla ultimately instructed Andoh to destroy the memorandum. Doc. #51-2 at 2-3. Third, she asserts

that there was a general culture of disrespect and discrimination among the faculty towards her because of her gender and religion, which manifested itself in a number of insults and discriminatory comments from other male professors, such as Yilma Gebremariam and Robert Eldridge. *See* Doc. #51-2 at 13, 15. Fourth, she alleges that, when she became eligible for promotion, the members of the Departmental Evaluation Committee (the "DEC") resigned rather than consider her, preventing her from being promoted. *See* Doc. #52 at 16. Her counsel conceded at oral argument that she was given another avenue to apply for a promotion at that time, but she did not apply.

Beyond March 2007, plaintiff continued to face conflict in the department. When a student challenged a grade received in plaintiff's class, defendant initially allowed the appeal even though, by its own procedures, the student's appeal was time-barred. Doc. #51-2 at 11-12. Plaintiff filed a grievance in 2008 related to this appeal, which defendant sustained, finding that the grade-appeal procedure had not been followed. Doc. #42-2 at 10.

In the summer of 2008, plaintiff sought to teach summer courses. Defendant did not permit her to teach the classes she wanted, but gave her teaching credit and paid her as if she had taught them. Doc. #42-2 at 9-10. Defendant avers that plaintiff requested summer classes after the deadline to make such requests. Doc. #42-6 at 2. Plaintiff denies this, but cites to no relevant evidence to contradict the claim. Plaintiff further contends that she and other women, Professor Judith Mills in particular, were denied summer classes, while the men were allowed to teach them.

In April 2009, at a meeting of the Economics and Finance Department, Gebremariam went on a "rant" about how women in the department were saying untrue things and slandering people's reputations. Doc. #52-1 at 37. Plaintiff believed that this rant was directed to her and

her colleague Judith Mills. At the same meeting, Professor Gary Crakes allegedly described the women in the department as "disgusting." Doc. #52 at 19. She filed another grievance regarding this incident, which defendant investigated, concluding that Crakes had referred to the department as a whole as disgusting and that no discrimination had taken place.

Around this time, plaintiff took an extended medical leave. Defendant prevented her from returning to classes during that semester, but she was permitted to take classes again the following semester. She was paid for this entire period. Doc. #52-1 at 57.

In July 2009, Selase Williams, school provost, announced to all the faculty of the Department of Economics and Finance that the undergraduate liberal arts degree in economics would be separated from the department and moved to the School of Arts and Sciences. She asked any faculty members who wished to focus their teaching responsibilities in the B.A. program to be voluntarily reassigned to the School of Arts and Sciences. Doc. #61-4 (Ex. 19). Plaintiff accepted this reassignment, and has conceded that the transfer was voluntary.

Subsequently, in July 2010, someone at the school discovered a swastika drawn on the bulletin board outside of plaintiff's office. Defendant immediately called the police to investigate, and Dean DonnaJean Fredeen called plaintiff to warn her about what had happened. Doc. #52 at 43. Although plaintiff contends that defendant did not conduct a good faith investigation of the incident, there is nothing in the summary judgment record to substantiate this claim. The identity of the vandal was never discovered.

In total, plaintiff has filed four grievances with the defendant, and defendant's Office of Diversity and Equity has investigated each one. Plaintiff settled three of them, and prevailed on the fourth, concerning the grade-change appeal. Plaintiff contends these investigations were not

4

conducted in good faith, but she does not provide a basis for such a finding other than her conclusory opinion. Docs. #52 at 12; #61-2 at 10.

Plaintiff also filed four affirmative action complaints, which defendant also investigated. She further contends that multiple Article 16 investigations—which could potentially lead to discipline—were opened against her, and were not resolved in a timely matter, creating anxiety for plaintiff.[1] Defendant concedes that there was one Article 16 investigation opened against plaintiff. When plaintiff discussed these supposedly open investigations against her with Jaye Bailey, Associate Vice President for Human Resources and Labor Relations, she was told that there were no investigations still open against her. Doc. #42-5 (Att. J).

Plaintiff filed a complaint with the Connecticut Commission on Human Rights and Opportunities on January 8, 2008. She filed this lawsuit in February 2009. She alleges that she was subject to an ongoing pattern of harassment and discrimination, impermissible retaliation, and a hostile work environment in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e. Defendant has moved for summary judgment on all counts. Doc. #42.

## DISCUSSION

The principles governing a motion for summary judgment are well established. Summary judgment may be granted only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014) (*per curiam*). "A genuine dispute of material fact 'exists for summary judgment purposes where the evidence, viewed in the light most favorable to the nonmoving party, is such that a reasonable jury could decide in that party's

---

[1] Article 16 of defendant's collective bargaining agreement with the professors' union requires that no discipline be imposed "without an investigation of the issue, notification of the charges, a description of the nature of the evidence and an opportunity for the member to respond." Doc. #42-6 at 5. An Article 16 proceeding is opened when the school is looking to investigate a professor to determine if discipline is appropriate.

favor.'" *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 843 (2d Cir. 2013) (quoting *Guilbert v. Gardner*, 480 F.3d 140, 145 (2d Cir. 2007)). The evidence adduced at the summary judgment stage must be viewed in the light most favorable to the non-moving party and with all ambiguities and reasonable inferences drawn against the moving party. *See, e.g.*, *Tolan*, 134 S. Ct. at 1866; *Caronia v. Philip Morris USA, Inc.*, 715 F.3d 417, 427 (2d Cir. 2013). All in all, "a 'judge's function' at summary judgment is not 'to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.'" *Tolan*, 134 S. Ct. at 1866 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)).

### *Timeliness*

I first address the timeliness of plaintiff's claims. A complaint of discrimination under Title VII must be brought within three hundred days of the date when the alleged unlawful employment practice occurred. *See* 42 U.S.C. § 2000e-5(e)(1). As plaintiff concedes, she filed her complaint with the CHRO on January 7, 2008, and therefore, absent an exception to this rule, her complaint could only cover events that occurred after March 13, 2007.

Plaintiff contends that all her claims are timely because the incidents she alleges were part of a continuous and ongoing practice. Under the continuing violations doctrine, "if a plaintiff has experienced a continuous practice and policy of discrimination . . . the commencement of the statute of limitations period may be delayed until the last discriminatory act in furtherance of it." *Fitzgerald v. Henderson,* 251 F.3d 345, 359 (2d Cir. 2001); *Sawka v. ADP, Inc.*, 2015 WL 5708571 at *9 (D. Conn. 2015). Such a violation may include a situation "where specific and related instances of discrimination are permitted by the employer to continue unremedied for so long as to amount to a discriminatory policy or practice." *Fitzgerald*, 251 F.3d

at 359. But discrete or isolated acts of discrimination do not constitute a continuing course of conduct absent evidence of a continuum or pattern. *Id.* at 359; *Sawka*, 2015 WL 5708571 at *10.

The record here no doubt reveals a highly dysfunctional working environment within the Department of Economics and Finance. Crediting plaintiff's version of events, it is entirely understandable that she would be displeased with the way she was treated over the course of more than a decade. Nonetheless, despite her sheer volume of complaints, the alleged incidents are not sufficiently similar to satisfy the continuing violations doctrine. For example, her complaints that co-workers made insulting and discriminatory remarks in 1994, or that she was not given adequate notice of meeting times, are "qualitatively different" from complaints that her colleagues interfered with her promotion efforts, or that the investigation into the vandalism outside her office was not sufficiently vigorous. *See Fitzgerald*, 251 F.3d at 364; *cf. Cornwell v. Robinson*, 23 F.3d 694, 704 (2d Cir. 1994) (there was a continuing violation where plaintiff "suffered the same kinds of harassment at the hands of some of the same" individuals). From the record before me I cannot find a pattern of discrimination linking older acts to new and dissimilar acts in a way that would conceivably satisfy the continuing violations doctrine. Any claims that plaintiff may have regarding pre-March 2007 incident are therefore time-barred.[2]

### *Disparate Treatment and Retaliation*

Plaintiff claims that she was discriminated against because she was a Jewish woman, and was retaliated against for filing grievances and affirmative action complaints. Title VII of the Civil Rights Act of 1964 makes it unlawful for an employer to discriminate because of an employee's sex or religion. 42 U.S.C. § 2000e–2(a)(1); *E.E.O.C. v. Abercrombie & Fitch Stores, Inc.*, 135 S. Ct. 2028, 2031 (2015); *Young v. United Parcel Serv., Inc.*, 135 S. Ct. 1338, 1344

---

[2] Of course, although claims arising from these incidents are time-barred, the allegations may still constitute relevant evidence that sheds light on the meaning or significance of later acts of alleged violations that are not time-barred. *See, e.g., United Air Lines, Inc. v. Evans*, 431 U.S. 553, 558 (1977).

(2015). Title VII also prohibits discrimination against an employee because she "opposed any [unlawfully discriminatory] practice" or "made a charge, testified, assisted, or participated in" a discrimination proceeding or investigation. 42 U.S.C. § 2000e–3(a); *Burlington N. & Santa Fe Ry. Co. v. White,* 548 U.S. 53, 56 (2006) (hereinafter *Burlington Northern*).

Plaintiff's discrimination and retaliation claims are governed by the familiar *McDonnell Douglas* burden-shifting framework. *See Ya-Chen Chen v. City Univ. of New York*, 805 F.3d 59, 70, 73-74 (2d Cir. 2015); *see also McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802–04 (1973). Accordingly, for her discrimination claim, plaintiff must present a *prima facie* case by demonstrating (1) that she belonged to a protected class; (2) that she was qualified for the position she held; (3) that she suffered an adverse employment action; and (4) that the adverse employment action occurred under circumstances giving rise to an inference of discriminatory intent. *See Tolbert v. Smith,* 790 F.3d 427, 435 (2d Cir. 2015). Similarly, for her retaliation claim, plaintiff must present a *prima facie* case by showing (1) that she participated in a protected activity known to the defendant; (2) that the defendant took an employment action disadvantaging her; and (3) that there exists a causal connection between the protected activity and the adverse action. *See Abrams v. Dep't of Pub. Safety,* 764 F.3d 244, 257 (2d Cir. 2014).

If plaintiff succeeds in making this *prima facie* showing, then "the burden shifts to the defendant, which is required to offer a legitimate, non-discriminatory rationale for its actions." *Aulicino v. New York City Dep't of Homeless Servs.,* 580 F.3d 73, 80 (2d Cir. 2009); *see also Ya-Chen Chen*, 805 F.3d at 70 (articulation of legitimate, non-retaliatory rationale required). If defendant meets that burden, plaintiff in turn must prove that the employer's stated reason was a pretext for discrimination or retaliation. *See Abrams,* 764 F.3d at 254; *Aulicino,* 580 F.3d at 80. In the context of the discrimination claim, plaintiff can only meet her burden if she shows both

that the employer's stated reason is untrue or incomplete, and that gender or religious discrimination was a motivating factor for the adverse action. *See Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 147 (2000); *Henry v. Wyeth Pharm., Inc.,* 616 F.3d 134, 157 (2d Cir. 2010). For the retaliation claim, plaintiff must show that the action would not have occurred but for a retaliatory motive. *Univ. of Texas Sw. Med. Ctr. v. Nassar,* 133 S.Ct. 2517, 2533 (2013); *Ya-Chen Chen*, 805 F.3d at 70.

Here, I conclude that plaintiff has failed to establish a *prima facie* case for either discrimination or retaliation. There is no triable issue of whether she suffered an adverse employment action within the relevant period. At oral argument, plaintiff identified two events that she claims constitute an adverse action against her. First, she claims that the dissolution of the DEC and her subsequent lack of promotion was an adverse action. Second, she points to the decision not to award her summer classes in 2007. The other incidents that could plausibly be construed as adverse actions that occurred within the statute of limitations period were: the initial sustaining of a student grade challenge; the allegedly bad faith investigations into plaintiff's complaints; the refusal to allow plaintiff to return from her medical leave of absence in the middle of the semester; and the alleged multiple Article 16 investigations opened against her without being resolved in a timely fashion.

In the context of a disparate treatment claim, an adverse employment action is "a 'materially adverse change' in the terms and conditions of employment." *Sanders v. New York City Human Res. Admin.,* 361 F.3d 749, 755 (2d Cir. 2004). It "must be more disruptive than a mere inconvenience or an alteration of job responsibilities." *Williams v. R.H. Donnelley, Corp.,* 368 F.3d 123, 128 (2d Cir. 2004) (Sotomayor, J.). Moreover, "the fact that the employee views

9

the [action] either positively or negatively does not of itself render [it][an] adverse employment action." *Ibid.*

The standard for a retaliation claim is slightly different. There, an adverse action need only have a tendency to "dissuade[ ] a reasonable worker from making or supporting a charge of discrimination." *Thompson v. N. Am. Stainless, LP,* 562 U.S. 170, 174 (2011) (quoting *Burlington Northern,* 548 U.S. at 53). But "[m]aterial adversity is to be determined objectively, based on the reactions of a reasonable employee," and "some actions may take on more or less significance depending on the context." *Tepperwien v. Entergy Nuclear Operations, Inc.,* 663 F.3d 556, 568 (2d Cir. 2011) (quoting *Burlington Northern,* 548 U.S. at 69–70).

First, any claims arising from the dissolution of the DEC are time-barred. Even if the resignation of council members—requiring plaintiff to seek promotion through an alternative path, which she did not pursue—was an adverse action, plaintiff does not contest that it occurred in 2005, roughly a year and a half outside the limitations period. Nor can any of the other events meet the standard for an adverse employment action. That defendant denied her the ability to teach summer classes one year—while still paying her for the classes she would have taught—is not a materially adverse change in employment, nor likely to dissuade an employee from raising a complaint about discrimination.

The same is true of the decision not to allow plaintiff to return to teaching classes in the middle of the same semester in which she took an extended leave of absence for medical reasons. Plaintiff continued to be paid and was reinstated to the same position with the same duties the following semester. *Cf. Joseph v. Leavitt,* 465 F.3d 87, 91 (2d Cir. 2006) ("[A]dministrative leave with pay during the pendency of an investigation does not, without more, constitute an adverse employment action."). Similarly, while the student grade appeal was originally

sustained, defendant conceded it had made an error in response to plaintiff's complaint and corrected its mistake. Plaintiff identifies no facts that would show that this event constituted a material change in employment circumstances.

Further, even if I were required to credit plaintiff's assertion, based on no personal knowledge, that the investigations into her complaints of discrimination were not carried out in good faith, that alone would not be enough to constitute an adverse employment action. *See Ya-Chen Chen*, 805 F.3d at 75 ("Quite simply, even if sincerely held, a plaintiff's feelings and perceptions of being discriminated against do not provide a basis on which a reasonable jury can ground a verdict."); *Fincher v. Depository Trust & Clearing Corp.*, 604 F.3d 712, 721 (2d Cir. 2010) ("[A]t least in a run-of-the-mine case such as this one, an employer's failure to investigate a complaint of discrimination cannot be considered an adverse employment action taken in retaliation for the filing of the same discrimination complaint."). Nor are investigations that do not lead to discipline typically adverse employment actions. *See Demaio v. Connecticut Dep't of Correction*, 2012 WL 892933 at *6 (D. Conn. 2012) ("An investigation . . . that does not result in discipline does not constitute an adverse employment action.").

In short, plaintiff has alleged no facts, supported by admissible evidence, that raise a triable issue about whether she suffered an actionable adverse employment action. She therefore cannot sustain her discrimination or retaliation claims. I will accordingly dismiss these claims.

### *Hostile Work Environment*

Plaintiff also claims that she was subject to a hostile work environment on account of her gender and religion. For Title VII claims, a hostile work environment exists if (1) "the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working

environment," *Moll v. Telesector Res. Grp., Inc.,* 760 F.3d 198, 203 (2d Cir. 2014), and (2) "the discriminatory conduct may be imputed to the employer." *Turley v. ISG Lackawanna, Inc.,* 774 F.3d 140, 153 (2d Cir. 2014).

Relevant factors include "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Desardouin v. City of Rochester,* 708 F.3d 102, 105 (2d Cir. 2013). Moreover, a hostile work environment claim requires more than just a hostile work environment—it requires proof that hostile acts "occur[ed] because of an employee's ... *protected characteristic,* such as ... national origin," rather than other reasons. *Rivera v. Rochester Genesee Reg'l Transp. Auth.,* 743 F.3d 11, 20 (2d Cir. 2014). That is because anti-discrimination laws protect against status-based discrimination and are not otherwise "a general civility code for the American workplace." *Burlington Northern*, 548 U.S. at 68; *Redd v. New York Div. of Parole,* 678 F.3d 166, 176 (2d Cir. 2012).

Further, an employer will be liable for a hostile work environment only if it was negligent with respect to controlling the working conditions that led to the offensive behavior, or when the harassing employee is plaintiff's supervisor. *See Vance v. Ball State Univ.*, 133 S. Ct. 2434, 2441, 2443 (2013). An employee will be considered a supervisor when the employer has empowered her "to take tangible employment actions against the victim, *i.e.*, to effect a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Id.* at 2443.

Here, plaintiff has barely shown a triable issue of a connection between what she claims was harassing treatment from her co-workers and her status as a Jewish woman. Most events that

plaintiff describes either were so minor as to not contribute to a hostile work environment, or on their face have no connection to her gender or religious affiliation. Plaintiff has alleged enough discriminatory insults, however, to create a genuine dispute of fact regarding whether her general treatment within the department was tinged with discriminatory motive. For example, alleged comments from Gebremariam that her life choices were not "right" and that she "should have more babies," though beyond the statute of limitations cut off, provide admissible background evidence suggesting some mistreatment by plaintiff's co-workers had a discriminatory motivation. *See* Doc. #52 at 12.

It does not follow from this analysis, however, that defendant can be held liable for plaintiff's alleged mistreatment. Plaintiff has not shown a triable issue either that the harassers were supervisors within the meaning of *Vance*, or that defendant was negligent with respect to the offensive behavior. Plaintiff has not alleged that Andoh, Gebremarian, Eldridge, or anyone else that allegedly made insulting comments were supervisors with the power to effect a significant change in her employment status. For the purposes of a hostile work environment analysis, they were merely her co-workers, not her supervisors. A court "can impute liability to the defendant[] only if [it was] 'negligent in controlling working conditions.'" *Lekettey v. City of New York*, __ Fed. App'x __, 2016 WL 482109, at *2 (2d Cir. 2016) (quoting *Vance*, 133 S.Ct. at 2439).

Plaintiff alleges no facts that could plausibly support an inference—much less a jury finding—that defendant was negligent or unresponsive to her complaints. *See id.* She asserts that defendant undertook bad faith investigations into her four grievance complaints, but does not base the claim on anything except conclusory allegations, supported by no personal knowledge of the material facts of the investigations. The undisputed facts are that plaintiff filed four

13

complaints, that defendant opened investigations into all four complaints, and that defendant found for plaintiff in one of them (the student grade appeal). Further, at least partly in response to acknowledged dysfunction in the department, defendant moved to split the department into two groups. No admissible evidence suggests that defendant ignored potential problems or acted negligently. Accordingly, no genuine issue of fact remains as to whether defendant may be liable for a hostile work environment.

## CONCLUSION

Defendants' motion for summary judgment (Doc. #42) is GRANTED. The Court takes no pleasure in granting summary judgment. As the parties are well aware, the Court had hoped that the parties could mediate their ongoing disputes, in view that they must still work together. The Court appreciates the efforts that the parties made. Although the Court is unable to conclude that plaintiff has a valid Title VII claim, the Court is hopeful that the parties will continue their dialogue in hope of improving the challenges that they may continue to face.

The Clerk of Court shall close the case.

It is so ordered.

Dated at New Haven this 3rd day of March 2015.

/s/ *Jeffrey Alker Meyer*
Jeffrey Alker Meyer
United States District Judge